## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

STACIE MEYER,

              Plaintiff,

      v.

SEARS OUTLET STORES,

              Defendant.

Case No. 16-10946
Hon. Terrence G. Berg

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DKT. 25)

### I.    Introduction

This is a gender discrimination case. Plaintiff Stacie Meyer alleges that Defendant Sears Outlet Stores ("SOS") discriminated against her on the basis of her gender when it fired her and replaced her with a male. Defendant has moved for summary judgment, which Plaintiff opposes. For the reasons outlined below, Defendant's motion is **GRANTED** in part and **DENIED** in part.

### II.    Background

Plaintiff was a General Manager II ("GM II") at the Livonia, Michigan Sears Outlet Repair and Distribution Center ("ORDC") when Defendant fired her and replaced her with a male in July of 2015. Dkt. 25, Pg. IDs 519, 530. Plaintiff had started with another

Sears entity in 2009 and had worked her way up the ladder—from Assistant Store Manager, to Manager, and eventually to GM II. Dkt. 25, Pg. ID 519. Plaintiff's complaint includes general factual allegations about her experience working for Defendant, which provides helpful context to Plaintiff's case. Plaintiff states that throughout her employment, she was repeatedly subject to discriminatory comments and conduct because of her sex and gender. Dkt. 6, Pg. ID 49. Plaintiff highlights one occasion that occurred in June 2012 (prior to Defendant's separation from Sears Holding Corporation) where she was passed over for a promotion. Plaintiff states she was outright told that she was passed up for the promotion because of her gender. Dkt. 6, Pg. ID 49.

This case involves Plaintiff's employment at Defendant's Livonia, Michigan ORDC. ORDCs prepare products for sale at Sears's outlet stores. Dkt. 25, Pg. ID 519. This process involves testing, repairing, and cleaning products and then shipping them out in floor-ready condition. Dkt. 25, Pg. ID 519. Defendant tracks how each ORDC does in this process, and releases a weekly "scorecard" that ranks the ORDCs in different categories of performance. Dkt. 25, Pg. ID 520.

Plaintiff's ORDC often had low rankings in four categories that showed that the ORDC was processing products slowly and sending

them out in poor condition. Dkt. 25, Pg. ID 521. Other metrics unrelated to the quality of the ORDCs work, however, compensated for the processing deficiencies, so the ORDC's overall ranking usually fell in the middle of the pack. Dkt. 25, Pg. ID 520.

In September of 2014, Defendant changed its management structure, which meant that Jonathan Waters became Plaintiff's supervisor. Dkt. 25, Pg. ID 521. He visited the Livonia ORDC the next month, and during the visit went through the building with Plaintiff and discussed issues he had discovered upon inspection. Dkt. 25, Pg. ID 521. It turned out that this walk-through was intended as a verbal warning that started Plaintiff on a Performance Improvement Plan ("PIP"), part of Defendant's progressive discipline process. Dkt. 25, Pg. ID 522. But Waters did not inform Plaintiff during the walk-through that she was being put on a PIP; Waters called Defendant's HR department after the meeting ended and had them deliver the message. Dkt. 25, Pg. ID 522.

The record shows that a typical PIP for an employee of SOS would last 90 days, with checkpoints conducted every 30 days to determine whether the employee is improving. Dkt. 29, Pg. ID 783. After the end of the initial 90-day period, the PIP either concludes or is extended. Dkt. 29, Pg. ID 783. If circumstances justify an extension, the extension is recorded in writing. Dkt. 29, Pg. ID 783.

Plaintiff maintains that her PIP was extended despite positive comments and feedback from Waters. Dkt. 29, Pg. ID 783. At his deposition, Waters acknowledged that Plaintiff was placed on an open-ended PIP, with no set time frame or completion date. Dkt. 29-1, Pg. ID 966. Waters testified that he could not recall documenting Plaintiff's PIP extension in writing. Dkt. 29-7, Pg. ID 978.

Waters returned in early December and completed another walk-through with Plaintiff. Dkt. 25, Pg. ID 523. The following day, on December 4, 2014, Waters presented Plaintiff with a Discipline/Corrective Action form, which identified areas where Plaintiff was not meeting Defendant's expectations. Dkt. 25, Pg. ID 523. On December 11, 2014, Plaintiff discovered that Defendant had sought to replace her by posting her job on Indeed.com. Dkt. 29, Pg. ID 779. On December 14, 2014, Plaintiff submitted a rebuttal letter detailing her disagreement with Waters' December 4, 2014 assessment of her performance and complaining of gender discrimination. Dkt. 25, Pg. ID 523.

Then there was a fire.

On December 28, 2014, at 12:54 a.m., the ORDC's alarm company placed a call to Plaintiff, but she did not answer the phone. Dkt. 25, Pg. ID 524. The alarm company called again at 1:15 a.m. Dkt. 25, Pg. ID 524. Plaintiff answered, and the company told her that motion had been detected in the ORDC and that police were

4

on the way. Dkt. 25, Pg. ID 524. The alarm company called Plaintiff again at 2:30 a.m. and informed her that there had been a fire at the ORDC. Dkt. 25-9, Pg. ID 712. Plaintiff then responded to the ORDC, arriving at 3:30 a.m. Dkt. 25, Pg. ID 525.

On December 31, 2014, following the fire, Defendant issued Plaintiff a final warning for "failure to follow company process on protecting company assets and continued instances of failure to follow operational procedures." Dkt. 25, Pg. ID 526. The final warning alleged that Plaintiff had failed to follow company policy when, after being informed of the alarm, she went back to bed instead of going immediately to the ORDC.[1] Dkt. 25, Pg. ID 526. It also alleged that Plaintiff was still failing to ensure that the products the ORDC shipped to outlet stores were cleaned properly. Dkt. 25, Pg. ID 526. And it warned that failure to follow company policy could result in termination. Dkt. 25, Pg. ID 526.

Plaintiff's performance improved after she received the final warning, but Defendant maintains that she continued to struggle when it came to the quality of product the ORDC was sending to outlet stores. Dkt. 25, Pg. ID 526. Defendant utilizes an annual performance review process to evaluate its employees. A performance review score includes a "Business Results" element—which is based

---

[1] Plaintiff denies this, arguing that there was no such written policy. Dkt. 29, Pg. ID 765-66.

on performance scorecards—as well as a "Behavioral Results" element, which is based on a manager's personal interaction with the employee. Plaintiff maintains that she was treated differently from male co-workers with respect to the calibration and reduction in her performance scores, and specifically her 2014 performance scores, which were calibrated in April of 2015. Dkt. 29, Pg. IDs 783-85. Plaintiff states she was one of three women GMs subordinate to Waters whose scores were lowered, while no other male GMs had their scores lowered by Waters. Dkt. 29, Pg. ID 793. Plaintiff emphasizes that Waters' subjectively calibrating her performance review score downward negatively affected her pay. Dkt. 29, Pg. ID 809.

Waters sent Plaintiff an email on April 21, 2015 that instructed Plaintiff to assign an employee to monitor the trucks leaving the ORDC and to give that employee the authority to stop from leaving the facility any item that was not in floor-ready condition. Dkt. 25, Pg. ID 527. Defendant argues Plaintiff ignored the instruction. Dkt. 25, Pg. ID 527. However, Plaintiff testified that an employee was in fact monitoring products that were leaving the facility, but that Plaintiff was not holding the employee responsible since "it was a whole group's team to work." Dkt. 25-2, Pg. ID 614.

After the email, the ORDC had more issues with dirty products leaving the facility. Dkt. 25, Pg. ID 528. On May 23, 2015, one store

manager complained that the facility had shipped a load of refrigerators that were rusted and smelly. Dkt. 25, Pg. ID 528. On May 24, 2015 another store manager complained that the facility had shipped two refrigerators that were covered in ash and soot. Dkt. 25, Pg. ID 528. So, on June 11 and 12, 2015, Waters visited the ORDC again to emphasize the importance of sending out clean products. Dkt. 25, Pg. ID 528.

Then came an incident involving refrigerators shipped with blue film on them.

On June 24, 2015, one of Defendant's executives visited a store in Taylor, Michigan, and saw that it was selling refrigerators that still had blue film on them—film Defendant states should not have been on refrigerators shipped from the ORDC. Dkt. 25, Pg. ID 528. So the executive told Waters' supervisor, Brandon Gartman ("Gartman"), who asked Waters to investigate further. Dkt. 25, Pg. IDs 528-29. One day later, on June 25, 2015, Waters called Plaintiff to inquire about what had happened. Dkt. 25, Pg. ID 529. At first he asked Plaintiff whether she had intentionally shipped "dirty" products to outlet stores. Dkt. 25, Pg. ID 529. She twice denied doing so. Dkt. 25, Pg. ID 529. Then he asked Plaintiff if she had intentionally shipped refrigerators with the blue film still on them, and she stated that she had. Dkt. 25, Pg. ID 529. Waters concluded that Plaintiff's denials of shipping "dirty" products were untruthful. Dkt.

25, Pg. ID 529. Defendant fired Plaintiff the next day, June 26, 2015. Dkt. 25, Pg. ID 529.

Prior to the blue film incident, Plaintiff had been told by Gartman and Waters that the Taylor store was a "priority store," and that Plaintiff should satisfy the store "by any means necessary." Dkt. 29, Pg. ID 771; Dkt. 29-1, Pg. ID 885. Furthermore, Mike Jordison, a District Manager for Defendant, personally called Plaintiff to request that she do everything in her power to ensure that the Taylor store was happy. *Id.* In June 2015, the manager of the Taylor store specifically asked Plaintiff to ship refrigerators with blue film on them because, according to Plaintiff's description of the call, customers demanded seeing the blue film as an indication that a given refrigerator is a new product. Dtk. 249, Pg. ID 771. Accordingly, Plaintiff maintains that by shipping refrigerators with blue film on them, she was merely satisfying the Taylor store, as she had been instructed to do by three levels of management at Defendant.

After her firing on June 26, 2015, Plaintiff filed a charge of discrimination with the EEOC in February of 2016, alleging that she was terminated due to her gender. Dkt. 25, Pg. ID 532. After investigation, the EEOC provided a Notice of Right to Sue. Plaintiff then brought this lawsuit. She has amended her complaint twice, and the most recent complaint contains four causes of action: (1) Discrimination in Violation of the Elliott-Larsen Civil Rights Act, (2)

Retaliation in Violation of the Elliott-Larsen Civil Rights Act, (3) Gender Discrimination (Title VII of the Civil Rights Act of 1964), and (4) Gender Discrimination in violation of the Equal Pay Act.

Defendant has moved for summary judgment on Plaintiff's claims. Following full briefing, the Court heard argument on May 31, 2017.

### III. Standard of Review

"Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue as to any material fact such that the movant is entitled to a judgment as a matter of law." *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 568 (6th Cir. 2013); *see also* Fed. R. Civ. P. 56(a). A fact is material only if it might affect the outcome of the case under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). On a motion for summary judgment, the Court must view the evidence, and any reasonable inferences drawn from the evidence, in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citations omitted); *Redding v. St. Edward*, 241 F.3d 530, 531 (6th Cir. 2001).

As the moving party, the Defendant has the initial burden to show that there is an absence of evidence to support Plaintiff's case. *Selby v. Caruso*, 734 F.3d 554 (6th Cir. 2013); *see also Celotex Corp.*

*v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party has met its burden, the non-moving party "may not rest upon its mere allegations or denials of the adverse party's pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial." *Ellington v. City of E. Cleveland*, 689 F.3d 549, 552 (6th Cir. 2012).

## IV.  Analysis

Plaintiff has brought four causes of action: Discrimination in Violation of the Elliott-Larsen Civil Rights Act (Count I), Retaliation in Violation of the Elliott-Larsen Civil Rights Act (Count II), Gender Discrimination – Title VII of the Civil Rights Act of 1964 (Count III), and Gender Discrimination – Equal Pay Act (Count IV).

### a. Gender Discrimination in Violation of Title VII and the Elliott-Larsen Civil Rights Act

"Cases brought pursuant to the ELCRA are analyzed under the same evidentiary framework used in Title VII cases." *Humenny v. Genex Corp.*, 390 F.3d 901, 906 (6th Cir. 2004). Thus, for both Plaintiff's Title VII claim and her ELCRA claim, she has two possible paths to success. First, she can present direct evidence of gender discrimination. *Terbovitz v. Fiscal Court of Adair County, Ky.*, 825 F.2d 111, 115 (6th Cir. 1987). Second, she can present circumstantial evidence of gender discrimination, which then triggers the *McDonnell-Douglas* burden-shifting framework. *Id.* at 114.

Here, there is no dispute that Plaintiff's claims depend on circumstantial evidence, so the Court must apply the *McDonnell-Douglas* framework.

The *McDonnell-Douglas* framework has three steps. First, Plaintiff must make a prima facie showing of discrimination. *Humenny*, 390 F.3d at 906. Second, if she makes that showing, the burden of production shifts to Defendant to provide a legitimate, non-discriminatory reason for the employment action. *Id.* And third, if Defendant provides such a reason, Plaintiff must then produce evidence that Defendant's proffered reason is a pretext for discrimination. *Id.*

### i. Plaintiff has made a prima facie showing of gender discrimination

To make out a prima facie case for gender discrimination, Plaintiff must show that she was (1) a member of the protected class, (2) subject to an adverse employment action, (3) qualified for the job, and (4) either treated differently than similarly situated male employees for the same or similar conduct, or replaced by a person outside the class. *Humenny*, 390 F.3d at 906; *Mitchell v. Toledo Hosp.*, 964 F. 2d 577, 582 (6th Cir. 1992). Defendant does not contest that Plaintiff has met all four prongs,[2] so the Court turns to the second

---

[2] Defendant argued in its opening brief argued that Plaintiff has not met prong four, but at oral argument Defendant conceded that Plaintiff has met prong four because she was replaced by a person outside the class. *See Mitchell,* 964 F. 2d at 582.

step, where Defendant must provide a legitimate, non-discriminatory reason for firing Plaintiff.

### ii. Defendant has provided a legitimate, non-discriminatory reason for firing Plaintiff

Because Plaintiff has made a prima facie showing of discrimination, Defendant must provide a non-discriminatory reason for firing her. Defendant has submitted two such reasons here. First, Defendant argues Plaintiff intentionally sent a truckload of refrigerators that still had film on them to a retail store, which violated Defendant's policy that requires employees to "remove exterior wrapping (vendor wrap)," "remove exterior tape," and "remove manufacturer labels/stickers from exterior." Dkt. 34, Pg. ID 1353 (citing Dkt. 25-5, Pg. ID 697). And second, Defendant maintains that when Waters confronted Plaintiff about whether she had done so, she lied to him by denying that she had done so, then later admitted the truth. Dkt. 34, Pg. ID 1353. Defendant fired her the day after she allegedly lied to Waters. Dkt. 34, Pg. ID 1353.

An employer has an appropriate business interest in ensuring adherence to its policies prohibiting the shipment of improperly prepared merchandise to its stores. And an employer has an appropriate business interest in ensuring that its employees are candid and complete in their statements to their supervisors during con-

versations about potential rules violations. Neither of these interests relate to an employee's gender, and both amount to legitimate reasons for an employee's termination.

### iii. There is a genuine issue of material fact as to whether the legitimate reasons offered for terminating Plaintiff were pretext for gender discrimination

Because Defendant has provided a legitimate, non-discriminatory reason for firing Plaintiff, the burden shifts back to Plaintiff to provide evidence that suggests that Defendant's proffered reasons are actually pretext for gender discrimination. She can do that in one of three ways: by showing the stated reasons (1) have no basis in fact, (2) were not the actual reasons for the termination, or (3) were insufficient to explain her termination. *Imwalle v. Reliance Med. Prods.*, 515 F.3d 531, 545 (6th Cir. 2008). Regardless of which rebuttal method she chooses, Plaintiff has the ultimate burden of producing sufficient evidence from which a reasonable jury could reject Defendant's explanation. *Id.*

Plaintiff maintains both that the given reasons for firing her were not the actual reasons, and that those reasons were insufficient to explain her termination.

In arguing that the reasons Defendant has provided were not the actual reasons for her termination, Plaintiff submits that the actual reason Defendant fired her is disputed; Waters says it was for the

refrigerator incident while Gartman says it was for Plaintiff's "performance." Dkt. 29, Pg. ID 796 (citing Gartman Dep., Dkt. 29-9, Pg. ID 997; Waters Dep., Dkt. 29-7. Pg. ID 978).

Plaintiff also contends that Defendant had made the decision to fire her long before the refrigerator incident. Dkt. 29, Pg. ID 796. To support her argument, Plaintiff highlights a sequence of events:

- Waters gave her a verbal warning (without telling her it was a warning)
- Waters gave her a written warning;
- Waters tried to replace her by posting her job on Indeed.com;
- Plaintiff submitted her letter complaining of gender discrimination;
- Waters decided not to hire anyone for the job posted on Indeed.com;
- Waters put Plaintiff on an indefinite PIP for being "off-process";
- Plaintiff addressed the issues that had led to her being put on PIP;
- Waters changed the reason for the PIP from "off-process" to "performance" and kept her on it;

And Plaintiff argues that she shipped the refrigerators with the film on them because the store manager receiving the refrigerators had requested them in that condition and because another one of her supervisors had told her to make that store manager happy "by any means necessary." Dkt. 29, Pg. ID 796.

In arguing that the reasons were insufficient to explain her termination, Plaintiff submits that she had remedied the issues with

her performance that were the basis for previous warnings and for the PIP. Dkt. 29, Pg. ID 796.

In reply, Defendant argues that the reasons Waters and Gartman provided for firing Plaintiff are not inconsistent, they were simply different formulations of the same reason: Plaintiff's performance. Dkt. 34, Pg. ID 1356.

In response to Plaintiff's argument that she was told both to make the store manager happy "by any means necessary" and to follow the ORDC cleaning process, Defendant points out that instead of seeking guidance on what to do, Plaintiff chose to elevate one instruction over the other and is now upset with Defendant's decision to fire her. Dkt. 34, Pg. ID 1355. Defendant characterizes the argument as a request that the Court second guess Waters' assessment of the situation and decision to fire her. Dkt. 34, Pg. ID 1355. Such second-guessing, Defendant argues, is outside the purpose of the anti-discrimination statutes—which were "not intended to diminish traditional management prerogatives." Dkt. 34, Pg. ID 1355 (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 259 (1981)).

Defendant attacks Plaintiff's position that she had remedied previous issues with her performance, arguing that her ORDC consistently ranked poorly in metrics under her control—such as quality surveys, age of inventory, and products ready for testing—and that

the high rankings Plaintiff points to stem from metrics (such as loss prevention) that had nothing to do with her personal performance. Dkt. 34, Pg. ID 1358. Defendant disputes other claims that Plaintiff makes about her performance—such as Plaintiff having a hard time because of having to hire union workers, and store managers giving her bad surveys on purpose to get her fired—but Plaintiff does not rely on those in her argument about whether Defendant's reason for firing her was pretext for discrimination.[3]

Having carefully reviewed the record, the Court concludes that Plaintiff's gender discrimination claims must go to a jury. There are genuine issues of fact that, when viewed in the light most favorable to Plaintiff, would permit a jury to find that Defendant's proffered reasons for firing Plaintiff are a pretext for discrimination. Depending on how the sequence of events is viewed, a jury might conclude that the reasons given by Defendant are insufficient to explain Plaintiff's termination, thus allowing a conclusion that the proffered reasons are a pretext.

---

[3] Defendant includes an argument that focuses on an allegation Plaintiff made in her counter-statement of material facts but did not rely upon in the relevant argument section of her brief: that the "ORDC process does not discuss blue film or tape, except to require that an employee leave blue interior manufacturer's packing tape in place." Dkt. 29, Pg. ID 771. Defendant argues that its policy *does* require the removal of blue film. Dkt. 34, Pg. ID 1353. Defendant then goes on to argue that Plaintiff cannot create a question of fact by disputing Waters' interpretation of company policy, and provides Sixth Circuit precedent to support the proposition. Dkt. 34, Pg. ID 1353. But because Plaintiff did not rely on this point in her brief, the Court will not address it.

On one hand, a jury could view the events as demonstrating that Defendant followed its process for terminating an employee for poor performance. The conduct of Defendant could be seen as:

- Warning the employee when she does something that is unacceptable;
- Waiting to see if there is improvement and placing the employee on a performance improvement plan (PIP);
- Warning her once more if she again does something unacceptable;
- Waiting to see if there is improvement;
- Starting the process to find a replacement in case there is no improvement; and
- Terminating the employee when she continues to perform poorly while on the PIP.

On the other hand, the facts could also be seen as consistent with a course of conduct that an employer might follow in order to discriminate against a female employee without getting caught. Specifically, the jury might see the Defendant's conduct as:

- Starting the formal process of a PIP, which can lead to termination, without telling the employee that is what is happening;
- Beginning the process of looking for a replacement without informing the employee that her job is in jeopardy;
- Departing from traditional practice by placing no time limit on the duration of a PIP, thereby preventing the employee from successfully completing it;
- Changing the justification for the PIP mid-stream so that there is a continuing need for the review;
- Waiting until a high-pressure situation arises that warrants an exception to a written rule and therefore creates a catch-22 for the employee—she must either

violate the rule or respond inappropriately to the situation; and

- Terminating the employee regardless of what she does.

How a jury may ultimately view this evidence will depend on how it weighs the credibility and quality of witness testimony—specifically the testimony of Waters. Waters claims that Plaintiff lied to him when he confronted her about shipping refrigerators with blue film still on them.[4] Dkt. 25, Pg. ID 529. But according to Plaintiff, Waters phrased the question differently between the first and second time he asked it: Waters first asked Plaintiff if she had knowingly shipped "dirty" products (to which she responded "no"), but then asked if she had knowingly shipped refrigerators with the film still on them (to which she responded in the affirmative). Dkt. 29, Pg. IDs 771-72. Waters took her second answer as an admission that her first answer was a lie, and claims he fired her for making this misstatement. Although "dirty" might be a term of art in the industry, a jury could find that the shift in questioning was meant

---

[4] The Court recognizes that Waters' account of this conversation differs somewhat from Plaintiff's. (Waters says he asked if Plaintiff shipped merchandise which was "not show-room ready" rather than merchandise which was "dirty." Dkt. 25-4, Pg. ID 668.). In addressing Defendant's motion for summary judgment, the Court views the evidence and all reasonable inferences drawn therefrom in the light most favorable to the non-moving party. *See Matsushita*, 475 U.S. at 587. Thus, here, the Court will view the evidence regarding the conversation at issue in the light most favorable to Plaintiff.

to confuse Plaintiff so that she would deny shipping "dirty" products, which, according to Waters' interpretation of the word, would then be a lie. If a jury reached that conclusion, it could then conclude that the proffered reasons for Plaintiff's termination did not actually motivate Defendant, and were instead a pretext for discriminating against Plaintiff. Thus, although Defendant has presented a legitimate business reason in support of its termination decision, there is a genuine issue of fact as to whether that was the reason for Plaintiff's termination, meaning that a jury could conclude the proffered reason was a pretext for discrimination. Defendant is therefore not entitled to summary judgment on Plaintiff's gender discrimination claims under Title VII and the ELCRA.

### b. Retaliation in Violation of the Elliott-Larsen Civil Rights Act

The *McDonnell-Douglas* burden-shifting framework applies to ELCRA retaliation claims that rely on indirect evidence of retaliation. *Gordon v. Traverse City Area Pub. Sch.*, No. 16-1613, 2017 U.S. App. LEXIS 6487, at *10-11 (6th Cir. 2017). Thus Plaintiff must first establish a prima facie case of retaliation; then, if she does, Defendant must provide a legitimate nondiscriminatory reason for its termination decision; and if Defendant does, then Plaintiff must provide evidence that would permit a jury to conclude that Defendant's reason is actually pretext for retaliation. *Id*. The analysis is

different than it is for an ELCRA discrimination claim, however, because Plaintiff must meet different elements to make her prima facie showing.

To establish a prima facie case of retaliation under the ELCRA, Plaintiff must show: (1) she engaged in protected activity; (2) Defendant knew she engaged in protected activity; (3) Defendant took an employment action adverse to her; and (4) there is a causal connection between the protected activity and the adverse employment action. *Garg v. Macomb Cnty. Comm. Mental Health Servs.*, 472 Mich. 263, 273; 696 N.W.2d 646 (2005).

Here, Defendant argues that Plaintiff cannot meet the first and last elements of that showing.[5] Dkt. 34, Pg. IDs 1362-64. To engage in protected activity, an employee must raise a "spectre of a discrimination complaint." *McLemore v. Detroit Receiving Hosp. & Univ. Med. Ctr.*, 196 Mich. App. 391, 396 (1992). Plaintiff alleges that the letter she sent on December 11, 2014—in response to the written warning she received on December 4, 2014—was protected activity. Dkt. 29, Pg. ID 802. Defendant contends that Plaintiff's letter was not protected activity because it failed to use the word "discrimination," or specifically to claim that her gender affected Waters' assessment of her performance. Consequently, Defendant

---

[5] The Court will focus primarily on Defendant's arguments as presented in its Reply Brief, Dkt. 34, which applies the proper legal framework.

argues that Plaintiff's letter was too vague to raise the spectre of a discrimination complaint. Dkt. 34, Pg. IDs 1363-64.

Defendant also argues that Plaintiff cannot meet the fourth element because she cannot show a causal connection between her letter and Defendant's decision to fire her. This is because part of Plaintiff's argument is that, in response to her letter, Defendant delayed her termination for six months to make it look like it was not firing her because of her gender. Dkt. 34, Pg. ID 1362. Thus, Defendant submits, under Plaintiff's own theory of the case, her termination was not in retaliation for the letter she sent. Dkt. 34, Pg. ID 1362. The Court finds that Plaintiff's retaliation claim must go to a jury.

i. **Plaintiff has made a prima facie showing of retaliation**

Defendant argues it is entitled to summary judgment on Plaintiff's retaliation claim because Plaintiff's letter was "too vague" to raise the spectre of a discrimination complaint. Plaintiff's position is that her letter was protected activity because she included in it these two sentences:

> I have tolerated mistreatment as a female employee in a mostly male dominated workplace. I will not sit idly by and allow you to demean the performance of myself and the employees under my direction.

Dkt. 30-11, Pg. ID 1280.

To be sure, Plaintiff did not use the magic words "I have been discriminated against based on my gender and I will file a formal complaint if the discrimination continues." But if she had, her letter would contain much more than a spectre of a complaint, it would be a full-on complaint. Instead, Plaintiff says in the letter that she has been mistreated "as a female employee in a mostly male dominated workplace." *Id.* If those words do not exactly bellow "GENDER DISCRIMINATION," they certainly speak to the issue in an audible tone of voice. And Plaintiff says further that she will "not sit idly by" while her performance is demeaned; that implies she will do something about it if the demeaning continues—something like filing a formal complaint, perhaps. The Court finds that Plaintiff's letter raises a spectre of a gender discrimination complaint and therefore constitutes protected activity under the ELCRA.

Defendant does not directly dispute whether Plaintiff has satisfied elements two and three of her prima facie showing of retaliation. Dkt. 25, Pg. IDs 538-40. Indeed, the record shows that after Plaintiff's complaint, she and Waters discussed it, thereby satisfying element two. Dkt 29, Pg. ID 803. Neither party contests that Defendant eventually terminated Plaintiff, which meets element three: an employment action adverse to Plaintiff.

### ii. **There is a genuine dispute of material fact as to whether a causal connection exists between Plaintiff's letter and her eventual termination**

Defendant argues that it is entitled to summary judgment because Plaintiff cannot establish element four of her prima facie case for retaliation: a causal connection between her protected activity and eventual termination. Dkt. 25, Pg. ID 539-40. Defendant maintains that Plaintiff's own theory of her discrimination claim undermines any showing that her letter caused her termination:

> Plaintiff claims that Waters sought to terminate Plaintiff's employment in December 2014, and that "[t]he only reason Waters' plan to terminate Plaintiff halted is because Plaintiff complained of gender discrimination on December 14, 2014" Thus, under Plaintiff's own theory of the case, Plaintiff's termination was *not* in retaliation for protected activity, but instead, was merely delayed as a result of Plaintiff's rebuttal to her written warning.

Dkt. 34, Pg. ID 1362 (citing Dkt. 29, Pg. ID 796).

Defendant highlights that Plaintiff's own theory of the case is that the immediate impact of Plaintiff's discrimination complaint was Defendant's decision *not* to fill the posted position for Plaintiff's job with haste. Dkt. 34, Pg. ID 1362. Defendant maintains that Plaintiff was terminated for shipping product in violation of Defendant's cleaning process and for performance.

Plaintiff argues that there is indeed a connection between her letter complaining of discrimination and Defendant's decision to terminate her, albeit six months later. For support, Plaintiff points

to the same sequence of events that she does for her discrimination claim, except for the verbal and written warnings. Dkt. 29, Pg. ID 805. Further, Plaintiff argues that Defendant deliberately waited six months to terminate Plaintiff in order to fabricate reasons that would appear legitimate and non-discriminatory. Dkt. 29, Pg. ID 804-06.

Plaintiff's retaliation claim must go to a jury. The apparent disagreement between the parties about the circumstances surrounding Plaintiff's termination represents a genuine issue of material fact. As it would Plaintiff's discrimination claim, a jury viewing this evidence will evaluate it differently depending on how it weighs the credibility and quality of witness testimony. If it disbelieved Defendant's witnesses, a jury could find that Defendant intentionally waited six months from Plaintiff's protected activity in order to manufacture false, alleged nondiscriminatory reasons to terminate Plaintiff, and further that Plaintiff's discrimination complaint was a "significant factor" in Defendant's decision to terminate her. If a jury so found, they could also conclude that Defendant's "performance" justification was merely a pretext for retaliation against Plaintiff for her letter highlighting what she believed to be gender discrimination. Since the circumstances surrounding Plaintiff's termination are material to Plaintiff's retaliation claim—the details

and implications of which the parties genuinely dispute—Defendant is not entitled to summary judgment on this claim.

### c. Gender Discrimination – Equal Pay Act

To state a claim under the Equal Pay Act ("EPA"), Plaintiff must prove that Defendant paid members of the opposite sex different wages for equal work on jobs that required equal skill, effort, and responsibility, and which were performed under similar working conditions. 29 U.S.C. § 206(d)(1); *Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974). If a prima facie case is proven, the burden then shifts to the defendant to establish that the disparity is due to seniority, a merit wage system, a system which measures earnings by quantity or quality of production, or any other factor other than sex. 29 U.S.C. § 206(d)(1); *Corning*, 417 U.S. at 196-97.

Defendant argues that Plaintiff cannot establish her prima facie case because her salary was higher than the average GM II salary. Dkt. 25, Pg. ID 542. Defendant emphasizes that the two employees Plaintiff compared herself to throughout the course of discovery were two of the highest earning GM IIs, and that she cannot show pay inequality by cherry picking two of the highest paid employees and ignoring those making less than she was. Dkt. 29, Pg. IDs 541-42. Defendant also argues that the disparity in pay between Plain-

tiff and the employees Plaintiff compares herself to is due to a disparity in credited time of service and job duties, not gender. Dkt. 25, Pg. ID 543.

Plaintiff responds that she has established a prima facie case because her predecessor, Dax Hofmann, and her successor, Anthony Harris, both earned more than she did. Dkt. 29, Pg. ID 807. Plaintiff also compares herself to two other male employees—Nicholas Barbieri and Ryan Tavenor—who had lower years of credited service but still earned more than Plaintiff. Plaintiff emphasizes that Defendant has no written policy for determining pay for GMs, and that her performance review score—which Waters subjectively calibrated downward—affected her pay. Dkt. 29, Pg. ID 809. These facts, Plaintiff submits, would allow a jury to find that Defendant paid Plaintiff 82% of what it paid her immediate successor, and that that discrepancy was due to Plaintiff's gender. *Id.*

> i. **Plaintiff's prima facie case for gender discrimination in violation of the Equal Pay Act**

"[A] plaintiff may meet her prima facie burden by demonstrating a wage differential between herself and her predecessor," *Buntin v. Breathitt Cnty. Bd. of Educ.*, 134 F.3d 796, 799 (6th Cir. 1998), or between herself and her successor. *See Perkins v. Rock-Tenn Servs., Inc.*, 190 F. Supp. 3d 720, 725 (W.D. Mich. 2016).

The Court finds that Plaintiff has made a prima facie showing of an EPA violation based on the disparity between Plaintiff's salary and that of her immediate successor, Anthony Harris. The Court also finds Plaintiff has made a prima facie showing of an EPA violation with respect to Plaintiff's salary as compared to two of her male GM II counterparts—Nicholas Barbieri and Ryan Tavenor—who earned more than Plaintiff, despite having less credited service time. Dkt. 29, Pg. ID 788.

As to her predecessor, Dax Hofmann, however, Plaintiff has failed to make a prima facie showing. While the "equal work" element of the EPA does not require identical work, it does require that there exist "substantial equality of skill, effort, responsibility and working conditions." *Odomes v. Nucare, Inc.,* 653 F.2d 246, 250 (6th Cir. 1981). Plaintiff argues that she possessed the *skills* and *qualifications* needed to perform Hofmann's job as both General Manager and Store Manager because she had been a Store Manager in the past. Dkt. 29, Pg. ID 808-09. But Plaintiff does not contend that she, despite arguably having similar qualifications, *actually served* as both General Manager and Store Manager while under Defendant's employ, like her predecessor.

Instead, the record shows that Hofmann had more responsibilities than Plaintiff. According to Defendant, Hofmann had "significantly greater job duties as the manager of ***both*** the Livonia ORDC

and the attached retail store." Dkt. 34, Pg. ID 1364 (emphasis in original). Plaintiff does not contest this point. Plaintiff and Hofmann therefore did not perform "equal work" on jobs requiring equal skill, effort, and responsibility. Rather, the record shows that Hofmann's higher salary was the result of significantly greater job duties. Consequently, the Court finds that Plaintiff has failed to make a prima facie case of discrimination in violation of the EPA with regard to her salary as compared to that of her predecessor, Hofmann.

Nevertheless, Plaintiff has established a prima facie showing of an EPA violation based on the disparity between Plaintiff's salary and that of her immediate successor.

### ii. Defendant has established that the identified pay disparities are due to factors other than sex

Since Plaintiff has made a prima facie showing of gender discrimination in violation of the EPA, the burden shifts to Defendant to establish that the pay disparities are due to: (1) a seniority system; (2) a merit system; (3) a system which measures earnings by quantity or quality of production; or (4) any other factor other than sex. 29 U.S.C. § 206(d)(1); *Corning,* 417 U.S. at 196-97. "[N]ongender-based explanations for the wage differential are affirmative defenses [and] the defendant bears the burden of proof." *Buntin*, 134 F.3d at 799 (citing *Corning Glass Works*, 417 U.S. at 197). Where a

defendant seeks summary judgment on an affirmative defense on which it will bear the ultimate burden of proof at trial, summary judgment is proper "'only if the record shows that [Defendant] established the defense so clearly that no rational jury could have found to the contrary.'" *Beck-Wilson v. Principi*, 441 F.3d 353, 365 (6th Cir. 2006).

The Court finds that Defendant has met its summary judgment burden in demonstrating that the wage differentials between Plaintiff and Harris, Barbieri, and Tavenor, respectively, are based on factors other than sex.

### 1. Anthony Harris

The record shows that the disparity in pay between Plaintiff and her successor, Harris, is due to Harris' seniority. Defendant considers an employee's years of service with SOS as one of many factors in determining compensation. Dkt. 25-3, Pg. ID 641. When Harris was promoted to Plaintiff's position as GM II, he had 17 years of credited service with SOS. Dkt. 34, Pg. ID 1364. Moreover, Harris had a higher salary than Plaintiff even before he took over Plaintiff's position. Dkt. 34, Pg. ID 1364; Dkt. 25-2, Pg. ID 642. Defendant maintains that the disparity between Plaintiff's salary and Harris' salary is explained by Harris' 17 years of credited service with SOS compared to Plaintiff's 4 years. Dkt. 34, Pg. ID 1364; Dkt. 25-3, Pg. ID 641.

Plaintiff does not contest that Harris had 12 more years of credited service than Plaintiff and that Harris' salary was higher than Plaintiffs salary as GM II *prior* to him obtaining the GM II position. Instead, Plaintiff maintains that "[C]redited service does not completely resolve the pay discrepancy" and points to Barbieri and Tavenor's salaries as support. Dkt. 29, Pg. ID 809. The Court will address Plaintiff's claims regarding Barbieri and Tavenor below. But with respect to Harris, the Court finds that Defendant has satisfied its summary judgment burden by showing the pay disparity between Plaintiff and Harris was due to factors other than sex—namely, Harris' seniority and Defendant's compensation system which considers seniority when determining pay. Dkt. 25-3, Pg. ID 641. Plaintiff has adduced no evidence to contradict these non-gender-based reasons for Harris' higher pay. Consequently, there is no genuine issue of fact concerning Defendant's meeting this burden.

### 2. Nicholas Barbieri and Ryan Tavenor

Plaintiff identified two employees—Barbieri and Tavenor—with less years of credited service than Plaintiff, but higher salaries than she had. At argument, neither side could provide the Court with much information about either of these two individuals. Dkt. 29, Pg. ID 788. Defendant later submitted supplemental briefing that addressed Barbieri and Tavenor. Dkt. 37. This evidence supports Defendant's summary judgment burden by clearly showing that the

disparities in pay between Plaintiff and Barbieri and Tavenor, respectively, are justified by circumstances other than sex.

The EPA's exception providing that pay disparities may be due to any other factor other than sex does not include literally any other factor, but a factor that, at a minimum, was adopted for a legitimate business reason. *Beck-Wilson*, 441 F.3d at 364 (internal citations omitted). The Sixth Circuit has joined other circuits in finding that a wage differential based on education or experience is a factor other than sex for purposes of the Equal Pay Act. *Balmer v. HCA, Inc.,* 423 F.3d 606, 612 (6th Cir. 2005) (citing *Hutchins v. Int'l Bhd. Of Teamsters,* 177 F.3d 1076, 1081 (8th Cir. 1999), *Irby v. Bittick*, 44 F.3d 949, 956 (11th Cir. 1995), *Pouncy v. Prudential Ins. Co.,* 668 F.2d 795 (5th Cir. 1982)) abrogated on other grounds by *Fox v. Vice*, 563 U.S. 826 (2011).

Here, as highlighted in Defendant's supplemental briefing, Plaintiff does not have a college degree, had no prior experience running a warehouse, made more than the average GM II, and made more than the average *male* GM II. Dkt. 25-3, Pg. ID 641; Dkt. 37, Pg. ID 1596. In contrast to Plaintiff's educational background and level of management experience, Tavenor and Barbieri both have greater qualifications. The record reflects that Tavenor holds a Bachelor's degree, had over six years of management experience with other large retailers prior to his position with SOS, and

had a higher salary than Plaintiff before he was promoted to GM II. Dkt. 37-3, Pg. ID 1606. Similarly, the record shows that Barbieri holds a Bachelor's degree and a MBA, and had substantial prior distribution center experience before joining SOS. Dkt. 37-3, Pg. ID 1606.

Moreover, the record before the Court shows that Defendant calculates compensation based on a number of factors including: the market in which the employee works; the employee's salary history, experience, and education; and the employee's performance. Dkt. 25-3, Pg. ID 641. Defendant's supplemental briefing provides additional background explaining why Tavenor and Barbieri's salaries were higher than Plaintiff's based on several of the factors Defendant uses to calculate compensation. Gartman's sworn statement explains that the Newington, CT market, where Tavenor is located, supports a higher salary than the Livonia, MI market, where Plaintiff was located. Dkt. 37-3, Pg. ID 1606. Gartman's statement also explains that Barbieri was hired for SOS's expanded and remodeled Kansas City, MO ORDC, which was the first of its caliber in the country, that SOS hired Barbieri with the desire to groom him for upward movement in the management chain, and that Barbieri was already making a significant salary at his previous job. Dkt. 37, Pg. IDs 1596-97, 1606.

Businesses have a legitimate interest in attracting, hiring, and retaining the best employees that they can. Employees with higher education and more prior relevant work experience are likely more attractive candidates for employment, with greater ability to command higher pay, than those without such qualifications. Indeed, the Sixth Circuit has before acknowledged that increasing pay rates to combat attrition and retention problems is a legitimate business reason for purposes of the EPA. *See, e.g., Beck-Wilson*, 441 F.3d. at 368-69.

Here, Defendant has presented substantial evidence that the differences in Plaintiff's salary and Barbieri's and Tavenor's salaries are based upon factors other than sex. The Court finds that Defendant has carried its summary judgment burden by showing that the differences in pay between Plaintiff and Barbieri and Tavenor are supported by legitimate business reasons, such as differences in market, salary history, experience, education, and a desire to retain its employees for future growth and development. Therefore, the Court finds that Defendant has so clearly demonstrated its defense to Plaintiff's EPA claim such that no rational jury could find to the contrary. Defendant is therefore entitled to summary judgment on Plaintiff's Equal Pay Act Claim.

## V.    Conclusion

For the foregoing reasons, Defendant's motion for summary judgment (Dkt. 25) is **GRANTED** with respect to Count IV, and **DENIED** with respect to Counts I, II, and III.

**SO ORDERED.**

Dated: September 20, 2017          s/Terrence G. Berg
                                   TERRENCE G. BERG
                                   UNITED STATES DISTRICT JUDGE

**Certificate of Service**

I hereby certify that this Order was electronically filed, and the parties and/or counsel of record were served on September 20, 2017.

                                   s/A. Chubb
                                   Case Manager